[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] Memorandum of Decision
The petitioner, Jason Day alleges in his petition for a Writ of Habeas Corpus initially filed on June 26, 1997 and amended on March 2, 2001, that his 1991 convictions for one count of capital felony murder in violation of CGS § 53a-54b, four counts of murder in violation of CGS § 53a-54a, and one count of assault in the third degree in violation of CGS § 53a-61 were obtained in violation of the Sixth andFourteenth Amendments to the United States Constitution and Article I, Section 8 of the Constitution of the state of Connecticut. He claims: (a) to have been deprived of the effective assistance of trial defense counsel by the Court's refusal to grant his counsel's request for continuance for further trial preparation, (b) to have been denied effective representation by his trial defense counsel, and (c) to have been denied effective representation by his appellate defense counsel. This matter came on for trial before this Court on January 29, 2003 and again on January 30, 2003 at which time testimony was received from the petitioner, both of his trial defense counsel, Attorney Patrick Culligan and the Hon. William Holden,[1] and his appellate counsel, Attorney Richard Emmanuel. Numerous pieces of documentary evidence were also received, including, inter alia, the transcript of the petitioner's trial on the underlying matter. For the reasons set forth more fully below, the petitioner has failed in meeting his burden of proof and the petition shall be denied.
As regards the claim of ineffective assistance of trial defense counsel, the petitioner alleges that his trial defense counsel failed: to obtain an independent forensic evaluation of paint flakes from a shovel found in a victim's automobile that was being driven by the petitioner; to obtain independent scientific DNA analysis at the locus of the bodies; to investigate the lack of shell casings on the stairwell of the murder scene; to establish the lack of petitioner's fingerprints at the crime scene, and; to establish the lack of blood on the firearm used in the murders. In addition, the petitioner alleges that his trial defense CT Page 2409 counsel failed to adequately prepare for trial within the time limits of the Speedy Trial statute, failed to move for a mistrial when juror misconduct was disclosed, failed to move to suppress a statement that the petitioner gave to the FBI agents who arrested him in Baltimore, MD. Finally, the trial defense counsel are alleged to have been ineffective by successfully moving to suppress evidence of a crack pipe that was found in the automobile being driven by the petitioner at the time of his arrest.
In respect to his appellate defense counsel, the petitioner alleges that his appellate counsel was ineffective by failing to raise on appeal that the statement was not preserved in written form and that the trial court should have granted a continuance. The Court has reviewed all of the testimony and evidence and makes the following findings of fact (further facts will be related as necessary to resolve specific claims).
Findings of Fact
1. The petitioner was the defendant in a case in the Judicial District of Fairfield at Bridgeport, under Docket Number 34964 entitled State v.Day. The petitioner was charged with one count of capital felony murder in violation of CGS § 53a-54b, four counts of murder in violation of CGS § 53a-54a, and one count of assault in the third degree in violation of CGS § 53a-61.
2. On March 4, 1991, the petitioner filed a pro se motion for a speedy trial. The Court granted that motion on March 6, 1991 despite objection by the petitioner's trial defense counsel.
3. On March 26, 1991, the Court granted the petitioner's motion to represent himself. The petitioner's trial defense counsel were appointed standby counsel.
4. Jury selection in this case began on March 27, 1991 and the petitioner represented himself through the selection of a jury and the first three state witnesses.
5. On May 21, 1991, the petitioner asked to have his standby counsel reinstated as his full counsel. The Court granted this motion on May 21, 1991.
6. Newly re-appointed trial defense counsel immediately sought a sixty-day continuance.
7. The motion was granted in part and the trial was continued for CT Page 2410 thirteen days.
8. As for the facts of the underlying offenses, the jury could have reasonably found that in early 1990, the petitioner resided in a one-bedroom apartment in Bridgeport with his girlfriend, Lisa G.; Lisa's brother, Raymond G.; Raymond's girlfriend, Theresa H.; Gloria S.; and Theresa's sons, five-year-old George G. and two-year-old Marcus G. Sometime before 10 p.m. on March 19, 1990, the petitioner shot and killed Raymond G., Lisa G. and George G. in the apartment. The petitioner also shot and killed Theresa H. while she was in her car in the parking area of the apartment house and dragged her body to an adjacent storage shed. Either before or after shooting Theresa H., the petitioner repeatedly struck her in the head with the blade of a snow shovel. Each victim was shot in the head from close range. Marcus G., who was present in the apartment when the shootings took place, had been slapped in the face by the petitioner but had not been shot.
9. The petitioner thereafter drove Theresa H.'s car to a hospital in New York City, where he requested treatment under an assumed name and was diagnosed as having a fractured toe. Although he was scheduled for surgery, the petitioner left the hospital before the operation was due to be performed. He subsequently was apprehended in a hospital in Baltimore by agents of the Federal Bureau of Investigation (FBI) on charges of unlawful flight to avoid prosecution. While in custody, the petitioner confessed his role in the killings to FBI agents.
10. The gun used to shoot the victims was a revolver. This revolver was recovered by the New York City Police Department underneath the front seat of Teresa H's car that had been left at the hospital in New York.
11. A blue snow shovel was found next to Theresa H.'s body. Blue flakes of paint were discovered on her body as well as on the steering wheel of the car the petitioner drove to New York City.
12. On July 22, 1991, the petitioner was convicted by a twelve-member jury on all counts. He was sentenced by the Court, McKeever, J. on October 23, 1991 to a total effective sentence of life in prison without parole.
13. The petitioner was represented at his trial by Attorneys Patrick Culligan, the Chief of the Public Defender's Capital Crimes Division, and William Holden, one of the attorneys assigned to the staff of the Public Defender's office in the judicial District of Fairfield.
14. The appeal of this conviction was denied by the Supreme Court in a CT Page 2411 decision entitled: State v. Day, 233 Conn. 813 (1995). Attorney Richard Emmanuel represented the petitioner on his appeal.
15. There was no petition for certiorari filed with the United States Supreme Court.
Discussion of Law
It is important at the outset to understand a critical difference between the legal status of a person who has been accused of a crime as opposed to one who has been convicted of a crime. While the person who has been accused of a crime is entitled to a presumption of his or her innocence, the petitioner in a habeas corpus petition is not. "It is undoubtedly true that `[a] person when first charged with a crime is entitled to a presumption of innocence, and may insist that his guilt be established beyond a reasonable doubt. In re Winship, 397 U.S. 385,90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).' Herrera v. Collins, 506 U.S. 390,113 S.Ct. 853, 859, 122 L.Ed.2d 203 (1993). . . The presumption of innocence, however, does not outlast the judgment of conviction at trial . . . Thus, in the eyes of the law, [the] petitioner does not come before the Court as one who is `innocent,' but on the contrary as one who has been convicted by due process of law." Summerville v. Warden, 229 Conn. 397
at 422-23 (1994).
Count I: Deprivation of Effective Assistance of Counsel by Court's Refusal to Grant the Defense Requested Thirty-Day Continuance
This claim has already been addressed and rejected by the Supreme Court in its decision on the petitioner's direct appeal. "On appeal, the defendant argues that the court's failure to grant a continuance for the full thirty days requires reversal of his conviction because it impaired his right to effective and adequately prepared counsel. We disagree."State v. Day, 233 Conn. 813 at 846 (1995). The petitioner has simply attempted to repackage this argument in a different wrapper.
The Supreme Court noted that "the defendant cited the need to conduct research, investigation and various tests in support of his continuance motion, all of which had been suspended by counsel during the period of the defendant's self-representation. The trial court indicated that it had weighed these factors in determining the length of the continuance that it granted. Against these factors, the court also considered its interests in the orderly progress of the trial. Since the jury already had been impaneled and the state had begun to present its evidence, these considerations were of significant weight. See State v. Hamilton,228 Conn. 247; State v. Beaulieu, supra, 164 Conn. 627-28. While there is CT Page 2412 no evidence that the continuance was sought with the intent of delaying the proceedings, that fact alone is not controlling. State v. Hamilton,supra, 247 n. 12; State v. Beckenbach, supra, 198 Conn. 50. The defendant has not indicated any specific instances of prejudice resulting from the court's grant of a continuance for two weeks rather than one month. We therefore will not second-guess the trial court's determination of the appropriate duration for a continuance. See State v. Hamilton, supra,228 Conn. 250. Accordingly, we hold that the trial court acted within its discretion." State v. Day, supra, 233 Conn. 813 at 847 (1995).
The petitioner has not provided any further elaboration in this habeas trial as to how, specifically, his counsel were rendered ineffective by the trial court's granting of a thirteen-day continuance vice a thirty-day continuance. Just as the Supreme Court saw no need to second-guess the discretion exercised by the trial court, neither does this habeas court. Consequently, Count I will not form a sufficient basis upon which this Court can issue the Writ of Habeas Corpus requested by the petitioner.
 II. Denial of Effective Trial Defense Counsel
In considering the alleged deficient performance of the petitioner's trial defense counsel, his claim of ineffective assistance of counsel must satisfy both prongs of the test set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 688, 104 S.Ct. 2052,80 L.Ed.2d 674, reh. denied, 467 U.S. 1267, 104 S.Ct. 3562,82 L.Ed.2d (1984), before the Court can grant relief. Specifically, the petitioner must first show "that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by theSixth Amendment." Strickland, infra at 687. If, and only if, the petitioner manages to get over the first hurdle, then the petitioner must clear the second obstacle by proving "that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." Strickland, infra at 687. In short, the petitioner must show both deficiency and prejudice. A failure to prove both, even though counsel's trial performance may have been substandard, will result in denial of the petition.
Trial in this Court of a habeas petition is not an opportunity for a new counsel to attempt to re-litigate a case in a different manner. It is indisputable fact that many times if one had foreknowledge of certain CT Page 2413 events; different courses might well have been taken. Likewise, a habeas court knowing the outcome of the trial "may not indulge in hindsight to reconstruct the circumstances surrounding the challenged conduct, but must evaluate the acts or omissions from trial counsel's perspective at the time of trial." Beasley v. Commissioner of Corrections,47 Conn. App. 253 at 264 (1979), cert. den., 243 Conn. 967 (1998). "A fair assessment of an attorney's performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances to counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Henry v. Commissioner ofCorrection, 60 Conn. App. 313 at 317 (2000).
It is not necessary to consider whether a trial counsel's performance was deficient if the habeas Court is satisfied that there was no prejudice to the defendant by the actions of the trial counsel in representing the petitioner. "A reviewing court can find against a petitioner on either ground, whichever is easier. Strickland v.Washington, supra, 697; see Nardini v. Manson, 207 Conn. 118, 124,540 A.2d 69 (1988) ('[a] court deciding an ineffective assistance of counsel claim need not address the question of counsel's performance, if it is easier to dispose of the claim on the ground of insufficient prejudice')." Valeriano v. Bronson, 209 Conn. 75 at 86 (1988).
In the instant case, it is clear that the petitioner's trial defense counsel did a superb job of representing the petitioner. The petitioner was charged with four murders and was facing a potential death penalty. Even with the extraordinarily high stakes involved in this case, the petitioner foolishly exercised his right to self-representation and initiated the process by which his counsel had to prepare for trial on an accelerated schedule by his speedy trial motion. Good sense finally overcame the petitioner and he wisely opted to have Attorneys Culligan and Holden restored to active participation as his trial defense counsel. Whatever hardships these attorneys faced at this point were the handiwork of the petitioner himself. Notwithstanding the petitioner's poor choices, his counsel were still able to save the petitioner from a sentence of death which is all the more remarkable with one of the murder victims being a five-year-old child.
Moreover, the evidence against the petitioner was strong. He was found to be driving a car belonging to one of the victims. This particular victim had been beaten with the snow shovel discovered lying next to her body. Paint flecks from this shovel were found on the head wounds of the CT Page 2414 victim and, significantly on the steering wheel of the car that the petitioner had been operating immediately after the murder. In addition, the petitioner's fingerprints were found on the snow shovel. Shell casings located at the crime scene matched shell casings from the revolver found underneath the front seat of the car being driven by the petitioner. The petitioner had driven to New York City to seek medical care for a traumatic injury to his toe, even though Bridgeport hospital was less than one block from the apartment where the murders took place. Most convincing was the statement attributed to Marcus G., the two-year old child that the petitioner slapped, but did not murder to the effect that it was "Jason" who had hurt him.
Turning to the specific complaints of the petitioner, he complains that his trial defense counsel failed to have the gun analyzed for microscopic traces of blood. There had been testimony from Dr. Henry Lee that the muzzle of the weapon was up against the victims' head when it was fired and that this should have resulted in there being some blood from the victim's being found on the gun. There had been testimony from the New York Police Department officers that they did not see any evidence of blood on the gun that they seized from Theresa H.'s car. The petitioner alleges that his trial defense counsel, in light of this testimony and the favorable inference to be drawn therefrom, were somehow deficient by not seeking out additional microscopic proof of the absence of blood. To be sure, if that had been the result of such an examination it would have been most desirable exculpatory evidence. On the other hand, had a detailed forensic examination found even a trace of blood belonging to one of the victims in the weapon that would have been catastrophic to the defense case.[2] Far from being ineffective, the petitioner's trial defense counsel showed excellent judgment in accepting the exculpatory evidence they already had and avoided the temptation to "gild the lily" and thereby potentially create inculpatory evidence.
This same logic applies with equal force to the other failures of investigation attributed to trial defense counsel. There had already been examination of the paint flecks by the state forensic lab. An independent evaluation would only have strengthened that finding. There is nothing that any sort of DNA analysis at the crime scene might have proven. There were no fingerprints of the defendant found at the crime scene and the lack of shell casings on the rear stairwell was readily explainable by the murder weapon being a revolver which, unlike a semi-automatic weapon, does not eject shell casings upon discharge.
The trial defense counsel did adequately prepare the case for trial, did move for a mistrial when there was an allegation of juror misconduct, and did move to suppress the petitioner's statement to the CT Page 2415 FBI agents in Baltimore. The fact that they were unsuccessful in the last two issues does not make their representation ineffective. If the petitioner has any point at all it might be with the issue of the crack pipe found in the car he had been driving. Petitioner's trial defense counsel successfully convinced the trial judge to suppress the evidence of the crack pipe. Now, petitioner argues that this was an error because one of the victims had been found at his autopsy to have had cocaine metabolites in his blood. Further, a toxicology screen run on the petitioner at the New York City hospital showed an absence of cocaine in the petitioner's system. The petitioner argues that this crack pipe could have been inferred to belong to the decedent and that this supported the petitioner's theory that it was a Jamaican drug posse that committed the murders. It is equally possible, however, that the jury might have concluded the crack pipe belonged to the petitioner. At any rate, given the paucity of evidence that the murders were committed by anyone other than the petitioner, it is clear that the trial defense counsel made a tactical decision that more harm than good would come from the admission of the crack pipe. This Court will not second-guess that decision.
Given all of the foregoing, Count II will not form a sufficient basis upon which this Court can issue the Writ of Habeas Corpus requested by the petitioner.
Count III: Ineffective Assistance of Appellate Counsel
The petition for a writ of habeas corpus is not a substitute for a direct appeal. "We have repeatedly and emphatically stated that habeas corpus cannot be used as an alternative to a direct appeal. Blue v.Robinson, 173 Conn. 360 (1977); Vena v. Warden, 154 Conn. 363 (1966);Wojculewicz v. Cummings, 143 Conn. 624 (1956)." What this means is that the petitioner cannot, as a sole basis for the granting of the habeas petition, allege that he was convicted as a result of an issue that he could have raised on direct appeal. However, he "may collaterally raise federal constitutional claims in a habeas corpus proceeding even though he has failed to appeal his federal constitutional claims directly . . . if he alleges and proves, by a fair preponderance of the evidence, facts which will establish that he did not deliberately bypass the orderly procedure of a direct appeal." Vena v. Warden, 154 Conn. 363 at 366
(1996).[3]
It is clear in the instant case that the petitioner could have raised the issue of the suppression of his statement to the FBI agents in his direct appeal. It is equally clear that a decision was made by appellate counsel not to raise that issue. Therefore, this Court will not even consider an attack upon the petitioner's conviction on the direct ground CT Page 2416 that this statement should have been suppressed at his trial. Notwithstanding this, however, the petitioner has alleged that he was denied the effective assistance of appellate counsel. Indeed, the petitioner alleges that the deficiency of performance by his appellate counsel was in not raising the issue of the suppression of the statement on the direct appeal. This is an issue that can, and indeed must be raised, if at all, through the filing of a habeas petition. "When a petitioner raises a claim of ineffective assistance of appellate counsel because his attorney did not raise an issue on direct appeal, the deliberate bypass standard should be utilized . . . [However] any claim invoking ineffective assistance of appellate counsel automatically satisfies the deliberate bypass requirement." Valeriano v. Bronson,209 Conn. 75 at 85 (1988).[4]
The standards for effectiveness of counsel set forth in Strickland v.Washington, 466 U.S. 668 (1984) apply with equal force to appellate counsel. In order to prevail in the instant habeas petition, then, the petitioner must prove first that he was denied the effective assistance of appellate counsel in that not only could his appellate counsel have raised the suppression issue on direct appeal, he should have done so. This will necessarily require a showing that his appellate counsel's performance "was so deficient that it fell below the standard of reasonably effective assistance; and, . . . that these errors deprived the defendant of a fair appeal and caused an unreliable conviction to stand." Valeriano v.Bronson, 209 Conn. 75, at 82 (1988). Then, the petitioner must prove that if the suppression issue had been raised on direct appeal, there was a reasonable likelihood that he would have prevailed upon that issue on direct appeal.
A petitioner must prevail upon both prongs of the Strickland test in order to have a petition granted. "A reviewing court can find against a petitioner on either ground, whichever is easier. Strickland v.Washington, supra, 697; see Nardini v. Manson, 207 Conn. 118, 124,540 A.2d 69 (1988) ('[a] court deciding an ineffective assistance of counsel claim need not address the question of counsel's performance, if it is easier to dispose of the claim on the ground of insufficient prejudice')." Valeriano v. Bronson, 209 Conn. 75 at 86 (1988).
Trial in this Court of a habeas petition is not an opportunity for a new counsel to attempt to re-litigate a case in a different manner. A habeas court "may not indulge in hindsight to reconstruct the circumstances surrounding the challenged conduct, but must evaluate the acts or omissions from trial counsel's perspective at the time of trial."Beasley v. Commissioner of Corrections, 47 Conn. App. 253 at 264 (1979), cert. den., 243 Conn. 967 (1998). "A fair assessment of an attorney's CT Page 2417 performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances to counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Henry v. Commissioner of Correction, 60 Conn. App. 313
at 317 (2000).
This is particularly true when one is attacking the decision of appellate counsel to not go forward on an issue on appeal. "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Jones v. Barnes,463 U.S. 745 at 751-52 (1983). Simply because there is an appellate issue that could be raised does not necessarily mean that it should be raised. "There can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review . . . A brief that raises every colorable issue runs the risk of burying good arguments in a verbal mound of strong and weak contentions." Jones v. Barnes, supra at 752-53. Moreover, it is inappropriate "for judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every `colorable' claim suggested by a client." Jones v. Barnes, supra.
Appellate Counsel must carefully pick the ground upon which he or she elects to stand and fight. "One of the first tests of a discriminating advocate is to select the question, or questions, that he will present orally. Legal contentions like the currency depreciate through over-issue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one . . . [E]xperience on the bench convinces me that multiplying assignments of error will dilute and weaken a good case and will not save a bad one." Justice Jackson, "Advocacy before the United States Supreme Court," 25 Temple L.Q. 115 at 119 (1951).
It is doubtful that the petitioner would have prevailed on the issue of the suppression of the statement even had it been raised. The petitioner asserts that since the FBI agents did not tape record or otherwise reduce his inculpatory statement to writing that this fact, in and of itself, should have led to a suppression of the statement. The petitioner fails to cite any case law to support his position. Upon reviewing the transcript, in particular Petitioner's Exhibit 13, it is abundantly clear CT Page 2418 that the FBI agents did properly advise the petitioner of his right to silence and rights under Miranda v. Arizona, 384 U.S. 436 (1966), that the petitioner waived those rights and made a voluntary statement to the FBI Agents. Further, while it is true that there is no tape recording of the petitioner's own voice making this inculpatory statement, the evidence is that the FBI agent dictated the substance of this statement into a hand-held tape recorder in the presence of the petitioner who had a full opportunity to make any corrections he felt to be necessary. It is clear that the trial court was correct in allowing this oral confession into evidence and that any inference that could be drawn in regard to the lack of a written or tape-recorded statement in the victim's own hand or voice should go to the weight to be attached to the statement.
While it is clear, then, that the appellate counsel could have raised the suppression issue, it was clearly a tactical decision to not do so. Given the small likelihood of success and the tendency of this to weaken another potentially more fruitful issue, this Court is disinclined to find that the appellate counsel should have appealed the issue. Since the petitioner would not have prevailed on this issue, his petition alleging ineffective assistance of appellate counsel will necessarily fail.
Accordingly, the Petition for a Writ of Habeas Corpus is denied.
S.T. Fuger, Jr., Judge